IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT ROSS, | ) | Case No. 2:14-CV- |
| | ) | |
| Plaintiff, | ) | CIVIL COMPLAINT |
| | ) | |
| vs. | ) | |
| | ) | |
| EDUCATION MANAGEMENT CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT IN CIVIL ACTION

AND NOW comes the Plaintiff, by and through trial attorney, Erik M. Yurkovich, Esq., who files this Civil Complaint, based upon the following.

### I. PARTIES

1. The Plaintiff is Scott Ross ("Ross"), former employee of Defendant, who resides at 25 Hancock Camp Road, Pittsburgh PA 15238 .

2. The Defendant is Education Management Corporation ("EDMC"), former employer of Plaintiff, who has offices at issue located at Education Management Corporation, 1400 Penn Ave., Pittsburgh, PA 15222-4332.

### II.   JURISDICTION

3. This Court has jurisdiction over this case pursuant to federal question.

4. Ross alleges EDMC treated him less favorably because of his gender pursuant to Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. 2000 et seq. when it took adverse employment actions against him.

5. Ross alleges that he was retaliated against and suffered adverse employment actions within a short proximity of time after making complaints of discrimination.

### III.  FACTS

6. Ross has a lengthy history working in health care.

7. Ross began working for EDMC on or about June 11, 2008 in the position of assistant Director of Admissions.

8. EDMC manages three (3) online colleges, Argosy, South University and the Art Institute ("AI").

9. Human Resources Representative, Tracey Holst ("Holst") provided an offer letter establishing Ross's salary on or about December 3, 2011.

10. Ross accepted the offer.

11. Three (3) months later, Human Resources Representative, Julie Booth ("Booth"), lowered the salary amount because allegedly Holst made a mistake.

12. Ross was promoted three (3) times during his employment with EDMC.

13. Ross's last position was Director of Admissions.

14. Ross supervised Art Institute admissions, the vision, strategy, operation and recruitment goals.

15. Ross handled hiring and firing of admission staff, their reviews and training.

### A.  First Discipline Meeting

16. On, Friday, March 2, 2012, Holst, now a Human Relations Team member, met with Ross and told him he was under investigation.

17. Holst accused Ross of violating the EDMC drug policy.

18. Ross was provided a document and instructed to immediately go to the drug test center in Greentree for testing.

19. Ross complained to Holst that he was previously cleared of violations.

20. Ross was previously cleared of substance abuse by Vice President, Carla Caldwell ("Caldwell"), and Booth.

21. Holst told Ross that if he did not take the test immediately he would be terminated.

22. Ross arrived at the testing facility before 3:00 p.m. but it was closed.

23. Co-worker Ed Snee also arrived as he was also sent for testing.

24. Ross called Holst.

25. Holst told Ross she did not believe that the facility was closed and again said he needed to be tested or he would be terminated.

26. Holst sounded upset and was verbally combative.

27. Ross was unable to be tested on or about March 2, 2012.

28. Ross was scheduled to be off March 6, 2012 because his father was having surgery in Baltimore, Maryland.

29. Ross took his scheduled time off.

30. Ross took the drug test on March 7, 2012 and was notified that he passed on March 20, 2012.

31. On March 8, 2012, Ross complained about Holst by email to Head Human Resources Representative, Tracy Bonjean ("Bonjean") but received no response.

32. Ed Snee later resigned because he believed that he was treated less favorably than similarly situated females work conditions.

33. No female leadership team members were drug tested on or about this period of time.

### B. Second Discipline Meeting

34. On or about October 22, 2012, Holst met with Ross and accused him of showing favoritism to females Holst perceived as more attractive than other females.

35. Holst said he was under investigation.

36. Holst said that witnesses were being interviewed.

37. Only select females were interviewed.

38. On October 29, 2012, Ross was notified that he was cleared of Holst's allegation, that Ross allegedly treated females who were perceived as by Holst to be more attractive more favorably than females who were perceived by Holst to be less attractive.

### C. Termination

39. On March 25, 2013, Vice President, Carla Caldwell ("Caldwell") met with Ross at their regular 2:00 p.m. meeting.

40. Caldwell notified Ross that Jessie Buechel ("Buechel") complained that Ross scheduled too many students.

41. Caldwell told Ross he was under investigation.

42. Caldwell admitted to Ross that if Holst is assigned to the investigation, "you would probably be terminated because Holst is out to get you."

43. Caldwell also told Ross that Holst thinks that Ross falsified the drug test.

44. On March 26, 2013, Caldwell met with Ross at the end of the day.

45. Caldwell was accompanied by Human Resource Representative, Christine Worthy ("Worthy") by telephone.

46. Worthy replaced Booth who resigned.

4

47. Ross was sent him home on administrative leave for allegedly, "interfering with an investigation."

48. Holst called Ross on March 27, 2013 and accused him of "intimidating" an employee, Dana Barger ("Barger").

49. Holst strongly questioned Ross and Ross cooperated with a vehement denial and answers to her questions.

50. On March 28, 2013, Director of Human Resources, Robert Robichaud ("Robichaud"), telephoned Ross from Arizona.

51. Along with Holst and Caldwell, she terminated Ross based upon the "the findings."

52. Ross expressed confusion and asked for a definition of "the findings."

53. He was not provided further explanation and coldly told, "You're terminated, that's how it is."

### D. Pretext for Discrimination

54. Ross suffered a pattern of false allegations from female supervisors, some regarding female co-workers, that was discriminatory and untrue.

55. Ross complained of "discrimination," meaning that he was being treated less favorably because he was a man.

56. Within a short proximity of time of his last complaint, Ross suffered a termination of employment as a result of continued discrimination and retaliation.

57. The offered reason in support of discharge, "intimidation," was a pretext for discrimination and retaliation for the reasons below.

58. On or about March 21, 2013, Ross asked Barger to schedule two (2) students for class that were financially cleared and had their proof of graduation arrive late.

59. Barger was a direct report to Ross.

60. Barger did not object to his instructions or the manner they were verbalized.

61. There is no objective evidence that Ross did intimidate her.

62. Ross was also denied the company's progressive discipline prior to being terminated.

63. Other female supervisors tried to discipline Ross prior to his discharge; all those allegations were unsupported by fact and proved to be false.

64. As a result, Ross had no formal discipline on his employee record prior to his discharge.

65. Ross was never advised that he acted in a way that could be perceived as "intimidating."

66. Ross had no way of knowing that his actions could result in a discharge of employment.

67. Ed Snee was also a victim of reverse gender discrimination.

68. Snee was arbitrarily drug tested, was involuntarily transferred from Ross's supervision to the supervision of director of admissions, Christine Woods ("Woods").

69. Two days after being transferred, Woods put Snee on a performance improvement plan (PIP).

70. Snee was intentionally not provided needed support to succeed.

71. Snee resigned before he was terminated.

### E. DAMAGES

72. As a direct result of discrimination and retaliation, Ross lost a position paying a salary of approximately $95,000.00 per year with benefits.

73. Plaintiff lost his professional reputation.

74. Ross received unemployment compensation because he did not willful misconduct.

75. Ross never left the job market.

76. Ross gained meaningful employment with DML Oil & Gas Co. in a sales and marketing position, beginning in January of 2014.

## IV. COUNT I: GENDER DISCIRMINATION (MALE)

77. Ross is a male.

78. Ross alleges EDMC treated him less favorably because of his gender pursuant to Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. 2000 et seq. when it took adverse employment actions against him.

79. Ross was replaced by a female.

80. Ross requests all available relief for intentional discrimination, including compensatory and punitive damages.

## V. COUNT II: RETALIATION

81. Prior to his discharge, Ross complained about discrimination.

82. His complaints were not acknowledged or addressed.

83. Within a short proximity of time after making complaints of discrimination, Ross was terminated.

84. The reason in support of his termination is not credible and untrue.

85. Ross requests all available relief for intentional retaliation, including compensatory and punitive damages.

   WHEREFORE Plaintiffs prays for a judgment against the Defendant for all available relief, costs and attorney fees.

**JURY TRIAL DEMANDED**

Respectfully submitted,

ERIK M. YURKOVICH, ESQ.
PA. I.D. No. 83432
207 Pine Creek Road
Building 1, Suite 201
Wexford, Pennsylvania 15090
T: 724.933.9199
erik.yurkovich@gmail.com

8